1   Raymond P. Boucher, State Bar No. 115367
       ray@boucher.la
2   Hermez Moreno, State Bar No. 72009
       moreno@boucher.la
3   Milin Chun, State Bar No. 262674
       chun@boucher.la
4   Brian M. Bush, State Bar No. 294713
       *bush@boucher.la*
5   **BOUCHER LLP**
    21600 Oxnard Street, Suite 600
6   Woodland Hills, California 91367
    Tel:   (818) 340-5400
7   Fax:  (818) 340-5401

8   Jason K. Feldman, State Bar No. 213386          Mark A. Ozzello, State Bar No. 116595
       jason@feldmanwallach.com                        mozzello@aogllp.com
9   Ian Wallach, State Bar No. 237849               **ARIAS OZZELLO & GIGNAC, LLP**
       ian@feldmanwallach.com                       6701 Center Drive West, Suite 1400
10  **FELDMAN & WALLACH**                           Los Angeles, California 90045
    225 Santa Monica Blvd., 11th Floor              Tel: (310) 670-1600
11  Santa Monica, CA 90401                          Fax: (310) 670-1231
    Tel:   (310) 577-2001
12  Fax:  (310) 564-2004

13  Attorneys for Plaintiffs

14

15              **UNITED STATES DISTRICT COURT**

16      **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

17

18  C.M., by and through her Guardian ad      Case No.
19  Litem, Helen Cervantes, individually,
    and as successor-in-interest to RAMON     COMPLAINT FOR DAMAGES
20  TALAMANTEZ MENDOZA,
    Deceased; I.M., by and through his        1. VIOLATION OF 42 U.S.C. § 1983
21  Guardian ad Litem, Adelita Montes,        [EIGHTH AMENDMENT];
    individually, and as successor-in-
22  interest to RAMON TALAMANTEZ
    MENDOZA, Deceased; and RAMONA             2. VIOLATION OF 42 U.S.C. § 1983
23                                            [SUBSTANTIVE DUE PROCESS,
    TALAMANTEZ, individually, and as          FOURTEENTH AMENDMENT]
24  successor-in-interest to RAMON
    TALAMANTEZ MENDOZA,
25  Deceased, and as acting administrator
26  for THE ESTATE OF RAMON                   **DEMAND FOR JURY TRIAL**
    TALAMANTEZ MENDOZA,
27

28

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

Plaintiffs,

v.

ARNOLD SCHWARZENEGGER,
individually as former Governor of
California; MATTHEW CATE,
individually as former Secretary of the
CDCR; JAMES A. YATES,
individually as former Warden of
Pleasant Valley State Prison (PVSP);
and DOES 1 through 10, inclusive,

Defendants.

## WRONGFUL DEATH & SURVIVAL ACTION
## PURSUANT TO 42 U.S.C. § 1983

Plaintiffs C.M., by and through her Guardian ad Litem, Helen Cervantes, individually, and as successor-in-interest to RAMON TALAMANTEZ MENDOZA, Deceased; I.M., by and through his Guardian ad Litem, Adelita Montes, individually, and as successor-in-interest to RAMON TALAMANTEZ MENDOZA, Deceased; and RAMONA TALAMANTEZ, individually, and as successor-in-interest to RAMON TALAMANTEZ MENDOZA, Deceased, and as acting administrator of THE ESTATE OF RAMON TALAMANTEZ MENDOZA (collectively "PLAINTIFFS"), bring this action against Defendants ARNOLD SCHWARZENEGGER, individually as former Governor of California; MATTHEW CATE, individually as former Secretary of the CDCR; JAMES A. YATES, individually as former Warden of Pleasant Valley State Prison (PVSP); and DOES 1 through 10, inclusive, (hereinafter collectively "Defendants"). All allegations in this Complaint are based upon information and belief except for those allegations which pertain to Plaintiffs. Plaintiffs' information and belief are based upon, *inter alia*, the investigation conducted to date by Plaintiffs. Each allegation in this Complaint has evidentiary support or is likely to have evidentiary support upon further investigation and discovery.

# I.

# INTRODUCTION

1.     Decedent, RAMON TALAMANTEZ MENDOZA, was the biological father of Plaintiffs C.M. and I.M., both minor children, and was the biological son of Plaintiff RAMONA TALAMANTEZ. On November 10, 2013, he died at the age of thirty-one (31) when an infection attacked and overwhelmed his internal organs causing them to fail. The genesis of his infection was a unique micro-organism, a fungal spore, called *coccidiodes immitis*.

2.     *Coccidiodes immitis* is considered by scientists and medical professionals to be one of the most virulent infectious agents on earth. The fungus is endemic to the desert soil of the American Southwest, and particularly prevalent in the San Joaquin Valley, California.

3.     Once inhaled, the spore finds a host in the human lung and begins to multiply causing, in some patients, a serious, potentially fatal infection known as coccidioidomycosis, or "Valley Fever."

4.     In the early to mid-2000s the California Department of Corrections and Rehabilitation (hereinafter "CDCR") began experiencing dramatic increases in cases of Valley Fever among inmates housed in its facilities in the San Joaquin Valley. So dramatic, in fact, it drew local and national attention from the media, scientists, medical doctors and departments of health. In the year 2005, infections among inmates in San Joaquin Valley prisons totaled one hundred and eighty seven (187), with five (5) deaths. In 2006, the infection total rose to one thousand one hundred and forty five (1,145) inmates, a year-over-year increase of nearly 650%. Eight (8) inmates died in 2006.

5.     Beginning in 2007, the medical and scientific community began urging CDCR and state officials, including Defendants Schwarzenegger, Cate, and Yates, who held the power to change policies and protocols at these San Joaquin Valley facilities, to take action to mitigate the risk of Valley Fever and reduce the infection rates.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

6.     Defendants took no meaningful action in response, and the "spike" in infection rates from the early to mid-2000s became an epidemic by the end of the decade.

7.     In September, 2008, Decedent was transferred to Pleasant Valley State Prison ("PVSP"). Two prisons were uniquely affected by Valley Fever during the relevant time period: Avenal State Prison ("ASP") and PVSP. Infection rates at these two prisons soared hundreds (in the case of ASP), and <u>thousands</u> (in the case of PVSP) of times higher than the infection rates in their surrounding communities. Immunocompromised inmates such as Decedent[1], in particular, faced unconscionably elevated risk at these prisons, due to the added fact that immunosuppressed patients are 30-50% more likely to develop disseminated Valley Fever, the deadliest form of the infection.

8.     RAMON TALAMANTEZ MENDOZA was diagnosed with Valley Fever on or about March, 2009. By August, 2013, doctors confirmed that the infection had disseminated throughout his body and into his internal organs. RAMON TALAMANTEZ MENDOZA suffered an excruciatingly severe infection, marked by titer scores (the result of serological testing for the presence of antibodies in the blood) of 1:512 and 1:1024. As a reference point, infection is generally deemed severe when the titer score rised above 1:8 or 1:16.

9.     RAMON TALAMANTEZ MENDOZA died on November 10, 2013 at the age of thirty one (31) years, from multiple organ failure. The cause of death listed on Decedent's death certificate states "septic shock."

## II.

## <u>JURISDICTION AND VENUE</u>

10.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  Infliction of Valley Fever, a debilitating and potentially fatal disease,

---

[1] Decedent was a Type I diabetic and asthmatic.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

constitutes Cruel and Unusual Punishment, in violation of the Eighth Amendment to the United States Constitution, as it deprives Plaintiffs of a federally-guaranteed right under color of state law in contravention of 42 U.S.C. § 1983.

11.     Venue is proper in the Court, pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims occurred within the Eastern District of California.

12.     Pursuant to Local Rule 120(d), this case is appropriately commenced in the United States District Court sitting in Fresno, California, because a substantial portion of the conduct and actions giving rise to the claims made in this case occurred in the County in which this Court sits.

13.     Plaintiffs seek monetary damages, attorneys' fees and other available relief under 29 U.S.C. § 794a, and 42 U.S.C. §§ 1981, 1983, 1988, 2101, *et seq.*

### III.

### FACTUAL ALLEGATIONS

#### BACKGROUND OF COCCIDIOIDOMYCOSIS INFECTION

14.     Coccidioidomycosis (commonly known as "Valley Fever" or "San Joaquin Valley Fever" or simply as "cocci") has long been known as a serious infectious disease, which is contracted by the inhalation of an airborne fungus, *Coccidioides Immitis*. Once inhaled and lodged in various locations in the respiratory system, the spores grow and transform into large tissue-invasive parasitic spherules. These spherules then divide, enlarge, and rupture, thus, releasing as many as thousands of new "endospores" that can invade surrounding tissue or migrate through the blood to other tissues and organs, where they can repeat the process and continue to invade other locations in the body.

15.     Cocci is endemic in the soil of various areas of the Southwest. Nowhere is it more prevalent, however, than in the San Joaquin Valley of California.

The majority of those infected by the *Coccidioides Immitis* fungus will have minor symptoms that resolve themselves within weeks.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

16.     Although about sixty percent of those with Valley Fever are asymptomatic, others develop severe flu-like symptoms that typically last for weeks or months.

17.     Individuals with certain characteristics are at particularly high risk for developing the "Disseminated" form of Valley Fever that afflicted the Decedent, which otherwise affects approximately ten percent of the infected population.

18.     Disseminated Cocci is a serious infection indicated by a "titer score" of 1:16 or stronger and commonly affects soft tissues, bones, joints, and the membranes surrounding the brain and spinal cord.  A "titer score" is the most common measurement of the degree of a cocci infection.

19.     Once contracted, there is no iatrogenic cure for the disease.  Surgical excision of tissue and bone is the only medical response for some extrapulmonary infections of Coccidioidomycosis. Certain triazole compounds, including Fluconazole (400 mg/day), have been found to be effective in treating most presentations of Coccidioidomycosis, but the drug must be taken daily, and lifelong treatment with Fluconazole is recommended.  Fluconazole is expensive, but failure to take it religiously is even more expensive.  Of those patients who stop taking the drugs, approximately 75% will relapse into the life-threatening disease within one year.

**STATE OFFICIALS, INCLUDING DEFENDANTS, HAVE BEEN AWARE OF THE INCREASED RISK OF VALLEY FEVER AT PVSP**

20.     California health officials have known about the prevalence of Valley Fever in the San Joaquin Valley and the disease's acute risks to inmate health for over fifty (50) years.  *See* Smith, C. E.: The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever"), American Journal of Public Health 30, at p. 600

21.     In June of 1994, the United States Centers for Disease Control and Prevention (hereinafter the "CDC"), in its publication called the *Morbidity and Mortality Weekly Report* (MMWR), issued an article prepared by a group of physicians

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

6

and scientists preeminent in the field of infectious disease, entitled "Coccidioidomycosis - California, 1991-1993," reporting on the devastating impact of Valley Fever in California, as well as the fact that in the years 1991 through 1993, 70% of the reported cases of coccidioidomycosis in California arose in the San Joaquin Valley. *See* http://www.cdc.gov/mnwr/preview/mmwrhtml/00031453.htm.

22.     Two years later, in 1996, the National Foundation for Infectious Diseases held the Fifth International Conference on Coccidiodomycosis, and published a summary of the articles discussed at that conference. Included was the "California Health Services Policy Statement on Coccidiodomycosis", which stated that from 1991 to 1993, California was spending $60 million dollars on health care costs from Coccidiodomycosis infections. It noted and recognized that individuals, such as Decedent, were at a higher risk for acquiring Disseminated Coccidioidomycosis. The report identified the area that houses ASP as the most endemic for the cocci spores and the most likely place to generate cocci infections.  It identified, as preventative measures, the use of spherulin skin tests to identify those not vulnerable to Disseminated Cocci, the use of dust-control measures, masks, and the wetting of the soil.

23.     In September of 1996, Doctors Thea N. Kirkland and Joshua Fierer, both of the University of California-San Diego, School of Medicine, published an article in *Emerging Infectious Diseases* (another publication of the CDC), entitled "Coccidioidomycosis: A Reemerging Infectious Disease."  In this article, Kirkland and Fierer comment on the Valley Fever epidemic of 1991-1993 reported above, and state, ". . . the San Joaquin Valley, California, is one of the most highly coccidioidomycosis-endemic regions." *See* http://www.cdc.gov/ ncidod/eid/vo12no3/kirkland.htm.

24.     Despite this information, the CDCR built eight prisons within the hyper-endemic regions of San Joaquin Valley: Avenal State Prison; California Correctional Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   and State Prison, both at Corcoran; and Kern Valley State Prison.

2        25.    In 1996, the California Department of Health Services ("CDH"), Division

3   of Communicable Disease Control, published a Policy Statement on

4   Coccidioidomycosis. The CDH remarked that "[i]n California, coccidioidomycosis has

5   increased dramatically since 1991, causing substantial morbidity, occasional mortality,

6   and great economic impact, particularly for direct health care. Of special concern is the

7   highly susceptible nonwhite population…."

8        26.    According to the CDH, the direct health care costs to the state of

9   California as a result of the increase in coccidioidomycosis infections between 1991

10  and 1993, alone, "probably exceeded $60 million statewide." This estimate did not

11  include "costs for special care, lost wages, and cases that were never diagnosed."

12       27.    Additionally, the CDH reiterated prevention and control measures, such

13  as limiting participation in occupationally risky activities (excavation) for those

14  individuals who demonstrate immunity to cocci with a spherulin skin test, wetting

15  soil, practicing dust control, and using masks.

16       28.    The CDH's Policy Statement concluded as follows:

17           To control this coccidioidomycosis epidemic, we endorse
             plans by the centers for Disease Control and Prevention
18           (CDC) against emerging infections of all types, which
             include improving surveillance, doing applied research, and
19           developing strategies for prevention and control…In
             summary, coccidioidomycosis is a re-emerging infectious
20           disease that must be controlled; indeed, it is an excellent
21           candidate for prevention.
22

23       29.    On information and belief, Defendants, and each of them, at all times

24  relevant to the allegations herein, had a duty to stay apprised of policy statements and

25  recommendations by the CDH on issues directly effecting those, such as Plaintiffs'

26  Decedent, in their care and custody. This is especially true, considering the

27  astronomically increased risk of cocci infection at pvsp, where Plaintiffs' Decedent was

28  housed, as discussed *infra*.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

8

30.     For more than twenty years, the health and welfare of California's inmate population has been drastically impacted by CDCR's deliberate decisions of locating these prisons in the hyper-endemic region of the Central Valley, significantly overcrowding them, housing certain inmates at risk or at increased risk from Valley Fever, and failing to implement any of the remedial measures recommended to reduce inmate exposure to cocci.

31.     In November 2004, Renee Kanan, M.D., Deputy Director of Health Care Services at CDCR, wrote a memorandum to all health care managers, staff members, and other officials within CDCR regarding Valley Fever and its origin in soil fungus. *See* Kanan, Renee, M.D., "Valley Fever," Dept of Corrections Memorandum to Health Care Managers, dated November 5, 2004 (hereinafter "Kanan" or "Kanan Memo").

32.     The memorandum included a three-page overview of Valley Fever, its cause, diagnosis, symptoms, and treatment. The memorandum expressly admitted that: (a) prisons in Kern, Kings, and San Luis Obispo counties, which includes PVSP, are located within areas which host the dangerous cocci fungus in the soil; (b) Valley Fever has "potential lethality" for people exposed to the fungus, making it necessary for clinical staff at all CDCR institutions to maintain a high level of suspicion for the disease; (c) "winds and construction activity may cause the organism to be blown into the air where it can be inhaled, and pneumonia can occur"; (d) "[a] percentage of individuals exposed to coccidioides immitis . . . will progress to . . . pneumonia (the incubation period is up to four (4) weeks), or to disseminated disease; (e) "if dissemination occurs, it usually does so within the first six months following pneumonia"; (f) "[t]he risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks and immuno-compromised individuals"[2]; (g)

---

[2] Importantly, medical literature has recognized Diabetes Mellitus as a disease which compromises the immune system and subjects the patient to higher risk of infectious disease. Defendants knew this. In 2013, a Federal Receiver modified a Valley Fever exclusion policy to mandate exclusion of Type I diabetes patients from PVSP, due to risk of contracting the most deadly form of the illness.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   "[d]issemination usually occurs to the skin, bones and meninges, although any part of
2   the body can be involved"; (h) "dissemination occurs in 1 of every 300 patents with
3   pneumonia" but "[i]n Hispanics and blacks, it is 1 in 40"; (i) "a bone scan should be
4   obtained on all patients with known or suspected disseminated disease"; (j) bone
5   lesions, back pain and paraplegia may result from Valley Fever, and are often
6   asymptomatic; (k) "[a]symptomatic bone lesions can often be treated with observation;
7   however, the spine is a particularly common site of involvement and is often
8   accompanied by the gradual onset of back pain"; (l) "if spinal bone pain or abnormal X-
9   rays are ignored, collapse of the spine with trauma to the cord and paraplegia may
10  result"; (m) "[w]ith spine lesions, surgery is usually required to drain abscesses and
11  stabilize the spine"; and (n) skin lesions "imply a poor prognosis and often herald
12  widespread dissemination." *Id*.

13      33.   The Kanan Memo was and continues to be widely available to state
14  officials, including the Defendants, after it was initially distributed to CDCR officials.

15      34.   An August 3, 2006, internal memorandum from the director of Adult
16  Institutions at the CDCR further confirmed that CDCR officials knew that they were
17  exposing inmates to an elevated risk of Valley Fever. *See* Dovey & Farber-Szekrenyi,
18  *"Inmate Patients at High Risk of Valley Fever Excluded from Specific Central Valley*
19  *Institutions"*, CDCR Memorandum, dated August 3, 2006.

20      35.   An internal CDCR memorandum, dated October 27, 2006, to all
21  administrative personnel, ostensibly generated at the request of Sacramento government
22  officials, described the epidemic infection rates:

| 2001 | 42 Inmates | |
|------|------------|---------|
| 2002 | 38 Inmates | |
| 2003 | 80 Inmates | |
| 2004 | 66 Inmates | 1 Death |

Unfortunately, such action was five years too late to save Decedent's life.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

| 2005 | 187 Inmates | 5 Deaths |
|------|-------------|----------|
| 2006 | 1145 Inmates | 8 Deaths |

36.     The Cocci information set forth above was "an approximation of the number of inmates with positive Cocci lab results." *See* Durst, Karen, *"Coccidioidomycosis (Cocci) Report"*, CDCR Memorandum, dated October 27, 2006.

37.     Defendants, and each of them, were also apprised of the ongoing Valley Fever epidemic through a November 20, 2007, CDCR memorandum to institution staff, including wardens of eight prisons located in the hyperendemic area, including ASP, CSP, KVSP, PVSP, and Wasco, identifying a significant increase in the number of Valley Fever cases, "with deaths attributed to this disease," among inmates in the San Joaquin Valley in "calendar year 2005."

38.     On information and belief, between 2007 and 2010, hundreds of inmate requests for health services and 602 administrative appeals forms were submitted by inmates at Avenal and Pleasant Valley State Prisons seeking either heath care related to Valley Fever infection, or reassignment based on Valley Fever infection. 602 forms and appeals to the third level of administrative review are viewed, at a minimum, by the warden of the prison housing the complaining inmate. Therefore, prior to 2010, at the very least, Defendant Yates would have received continual notice that inmates were raising concerns about Valley Fever affecting their health and well-being.

39.     On information and belief, between 2007 and 2010, numerous lawsuits were filed wherein the 602 administrative forms as well as the memoranda referenced above were attached as exhibits to the complaints. Therefore, prior to 2010, at the very least, all Defendants received continual notice as to the hyper-susceptibility of certain inmates, like Decedent, as set forth in those memoranda as well as the continued concern of inmates that Valley Fever was infecting particular inmates at an alarming rate.

40.     In April 2012, the California Correctional Health Care Services (hereinafter "CCHCS") released a report titled, "Coccidioidomycosis in California's

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

Adult Prisons, 2006-2010", which concluded that incidence of coccidioidomycosis has been increasing in some prisons, with rates as high as 7% during 2006–2010. *See* Coccidioidomycosis in California's Adult Prisons 2006–2010. California Correctional Health Care Services Public Health Unit and Quality Management; 2012. As a result, the annual cost of coccidioidomycosis care and treatment in California prisons was estimated to exceed $23 million. *Id*. The report noted that "the incarceration of individuals . . . in prisons within the endemic areas will continue to provide a stream of challenging and costly cases of coccidioidomycosis." *Id*.

41. Though all of the prisons in the endemic areas presented a potentially elevated risk of exposing inmates to Valley Fever, there are two – ASP and PVSP – at which these risks are acutely amplified.

42. During 2006-2010, the rate at PVSP was significantly higher than rates in the county in which it is located. <u>Infection rates at PVSP during this time were as much as 1,000 times the rate seen in the general population</u>.

43. The CCHCS Report found that CDCR had done nothing between 2006 and 2010 that had any effect on cocci incidence rates at prison institutions in the San Joaquin Valley. This failure to act continued for years and exhibits deliberate indifference by state officials.

44. This report received general circulation among CDCR staff, including wardens, unit managers and executives; it was received by Defendants Cate and Yates.

45. Approximately 36 inmates detained at prisons within the San Joaquin Valley have died between 2006 and 2011 as a result of exposure to cocci. Decedent, one of them, has effectively been relegated to a statistic in a medical report.

## THE UNIQUELY ELEVATED RISK OF INFECTION AT PVSP

46. Though all of the prisons in the endemic areas presented a potentially elevated risk of exposing inmates to Valley Fever, these risks are acutely amplified at PVSP.

47. During 2006-2010, rates of Valley Fever in the hyper-endemic area

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

prisons worsened. The rates at Pleasant Valley State Prison, Avenal State Prison, Wasco State Prison, and North Kern State Prison, were each significantly higher than rates in the counties in which they are located. In comparison with the rate in California (7/100,000), **the rate at PVSP was 1,001 times higher (7011/100,000)**, the rate at ASP was 189 times higher (1326/100,000) and the rate at WSP was 114 times higher (800/100,000).

48.    Between 2006 and 2012, approximately 1,800 inmates became infected with Valley Fever at PVSP.

49.    The rates at PVSP, ASP, and WSP were also much higher than the rate in Kern County, the county with the highest rate of cocci in California (135/100,000). An April, 2012 retrospective study found that the infection rate at PVSP was approximately 7,011 cases for every 100,000 people, or 7 out of every 100.

50.    The CCHCS Report found that CDCR had done nothing at PVSP between 2006 and 2010 that had any effect on reducing cocci infection rates.

51.    The report received general circulation among CDCR staff, including specifically wardens, unit managers and executives, including Defendants Cate and Yates.

52.    Following the Kanan Memo, which warned that construction activity was associated with the increased exposure to the spores that cause Valley Fever, some experts observed that the probable cause of the rapid and continuing increase in Valley Fever cases at PVSP that began in 2005/2006 was the construction of a new state facility immediately adjacent to the prison. The excavation and construction churned up and broadcast Coccidioides spores through the air and on to bare soil and surfaces throughout the prison, where they took root to become an ongoing source of infection.19 Those spores spawned cocci colonies that pose an ongoing threat of Valley Fever infection at the prison currently and into the future.

53.    Dr. Pappagianis' report confirms "the influence of 'new construction' (including excavation)" on PVSP's Valley Fever rates as follows: "Construction began

in late Summer to early Fall [2005] and soon the number of cases increased. … It was evident that PVSP had a higher rate of infections than other institutions some of which had comparable numbers of inmates. By mid-August 2006, PVSP had 300 new cases recognized, far exceeding those recognized at (51) [at] Avenal, the next highest represented. We calculated incidence of 3,000/100,000 for PVSP in 2005; and in 2006 up to mid-August the rate was 6,000/100,000. For comparison, the highest incidence rate of [Valley Fever] was 572/100,000 for Kern County during the epidemic year 1993."

54.     From 2007 through 2010, the rate in PVSP was 6 times higher than the rate among residents of the adjacent state mental health facility built in 2005.

## DEFENDANTS KNEW OF THE PARTICULAR RISKS TO PLAINTIFFS' DECEDENT AND FAILED TO TAKE ANY MEASURES TO PROTECT HIM

55.     Epidemiological studies have established that Coccidioidomycosis in members of certain groups, including Asians, Hispanics, African-Americans, Filipinos, and American-Indians, <u>as well as individuals who may be immune-compromised or immune-suppressed,</u> are more likely to aggressively develop into the disseminated form of Valley Fever. *See* Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), pp. 314, 318, fns. 5, 27 (recognizing more than eight years ago the exceptional susceptibility of African-Americans and Filipinos to Valley Fever).

56.     In a letter dated March 16, 2006, from Duc Vugia, M.D., M.P.H. of the California Department of Health Services to Bernard Henderson, an inmate at PVSP, California's Department of Health Services referenced the exceptionally high-risk groups when it cited an article in a contemporaneous medical journal California's Department of Health Services. *See* Letter from Duc Vugia, M.D., citing Galgiani article (March 16, 2006)]; Galgiani, John et al., *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal 1217-1218 ["several-fold higher for persons of African or Filipino ancestry (possibly also for persons of Asian, Hispanic, or Native American

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  ancestry), and as <u>high as 30%-50% of infections for heavily immunosuppressed</u>
2  <u>patients</u>"].

3       57.    It is firmly established in the medical literature and reports personally
4  delivered and/or made available to Defendants, that Type I diabetes is a medical
5  condition which suppresses the immune system and subjects one to significantly
6  increased risk of the deadliest form or the Valley Fever infection, as is chronic asthma
7  treated with steroidal inhalers. Plaintiffs' Decedent suffered from both medical
8  conditions.

9       58.    In 2006, the California Department of Public Health, Center for Infectious
10 Disease conducted an epidemiological study of Valley Fever in California prisons
11 (hereinafter "the CDPH Study").  The CDPH Study was published in January 2007.

12      59.    The CDPH Study reported that any persons with suppressed immune
13 systems as a result of disease or medications which are immune-suppressive are at
14 extremely high risk of the deadliest form of Valley Fever.

15      60.    The CDPH Study recommended that the CDCR evaluate relocating these
16 highest risk groups to areas that are not hyper-endemic to coccidioidomycosis, and at a
17 minimum, to take steps to minimize exposure, including ventilation, respiratory
18 protection, and dust suppression and soil control.

19      61.    In August 2007, the Prison Legal News (hereinafter "PLN"), a specialty
20 periodical of extensive circulation in the prison community, ran as its cover story
21 CDCR executives' and officials' widespread knowledge of the substantial risk of harm
22 to high-risk groups from coccidioidomycosis. The PLN cover story described in detail
23 the source, exposure pathways, prognosis, and risk factors for the disease and its
24 endemic presence in the subject California prisons.

25      62.    After CDCR failed to act to address the risks to the susceptible racial and
26 ethnic groups, the federal Receiver finally took steps to force CDCR to relocate the
27 omitted higher-risk inmates.

28      63.    Joyce Hayhoe, a spokeswoman for the Receiver's office, disclosed that,

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

"[t]he State of California has known since 2006 that segments of the inmate population were at a greater risk for contracting Valley Fever, and mitigation efforts undertaken by CDCR to date have proven ineffective."  She stated that, "as a result, the Receiver has decided that immediate steps are necessary to prevent further loss of life."

64.    In November 2007, an amendment of the 2006 policy protected *only* persons with certain identified medical conditions.  The policy failed to protect any other inmates including those with Type I diabetes, although risks to those groups were already well-known to Defendants.

65.    Predictably, the 2007 policy failed to stem the epidemic of Valley Fever.

66.    Each Defendant, at all relevant times, have been aware that cocci has adversely, indiscriminately, and frequently [in significant proportions] affected inmates with medical conditions suppressing their immune systems, such as Decedent. Defendants have ready access to information concerning an inmate's medical background as part of his central file; classification and facility management are required to consider each inmate's medical conditions for purposes of appropriate housing determinations.

67.    Defendants knew that placing Decedent in PVSP, a prison in the San Joaquin Valley, with the prevalence of spore-laden soils, was hazardous to Decedent's health and posed an unacceptable risk of irreparable harm to all inmates, including Decedent.

68.    Despite this actual knowledge of both the risk and the appropriate remedial actions, Defendants took no steps to exclude Decedent from PVSP, statistically the single most deadly location in California for Valley Fever.

### DEFENDANTS FAILED TO EMPLOY REMEDIAL MEASURES AT PVSP

69.    Preventative measures that can effectively combat the spread of cocci have been documented in medical literature since the 1940s.  *See, e.g.*, Smith, C. E.: *The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*, American Journal of Public Health 30, at  600 (June 1940).

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

70.     Beginning in 2006, numerous experts from various organizations including the CDCR itself recommended, in addition to screening out at-risk inmates and transferring them away, designing and implementing simple, specific remedial measures at the hyper-endemic prisons in order to reduce inmates' exposure to the cocci-containing soil there. Besides the CDCR experts, the CCHCS, the California Department of Public Health ("CDPH"), and independent public health experts all recommended simple, specific remedial measures. These included landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outdoors under adverse conditions.

71.     In the November 20, 2007 memo, the CDCR recognized a mitigation approach that would transfer out of facilities like PVSP, inmates who meet the "cocci susceptibility exclusion criteria." As described in the memorandum, officials were urged to "[c]onsider planting ground cover or grass on open direct areas within prison grounds" and "[w]hen digging, use protective mask and wet the ground prior to digging."

72.     In 2008, Executive Order S-06-08 was issued by then-Governor, and Defendant Schwarzenegger, which declared a statewide drought and "strongly encouraged" local water agencies and districts to take aggressive, immediate action to reduce water consumption. The CDCR agents including Defendants Cate and Yates herein, and representatives interpreted Executive Order S-06-08 as a directive to stop maintaining such grass cover, thereby substantially increasing the risk that inmates at PVSP would contract Valley Fever.

73.     Each Defendant was aware that housing inmates at the hyper-endemic prisons posed a greatly elevated risk to those inmates of contracting Valley Fever and that failure to control exposure to the cocci-containing soil at those locations (such as by construction activity) increased that risk significantly.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

74.     Defendants were aware that individuals with immunocompromising medical conditions, including Plaintiffs' Decedent, are at higher risk for developing the disseminated form of cocci.

75.     Defendants' response to this disease has been totally inept and in clear violation of Plaintiffs' constitutional rights. Not only did Defendants place Decedent in harm's way, they then failed to implement even rudimentary measures recommended by the correctional authority's own medical experts to protect inmates, such as Decedent, from disease.

### DEFENDANTS FAILED TO DISCLOSE TO DECEDENT THE KNOWN RISKS

76.     Each Defendant responsible for CDCR-wide or facility-level inmate operations had the ability to disclose to Decedent essential facts regarding the risks from Valley Fever, the increased risk that the Decedent faced, and the fact that those increased risks, and Decedent's death, were caused by Defendants' actions, but instead purposely failed to disclose those facts.

77.     Defendants failed to disclose to Decedent the risk factors for the disease, the likelihood of exposure, the common symptoms and progress of the disease, the seriousness of the injuries it causes, the dangerous local conditions that increased Plaintiffs' likelihood of contracting the disease, and the fact that Defendants themselves were responsible for the increased risk that Decedent faced.

78.     Because these Defendants affirmatively failed to disclose these facts from Decedent, Decedent was not fully aware of the increased risks he faced at PVSP, that Decedent was particularly susceptible to those risks, or that Defendants' wrongful conduct had caused him to be exposed to those increased risks.

79.     Plaintiff relied on Defendants to provide such information and to adequately educate Decedent about those risks and the nature of Decedent's injuries, and Defendants intended that Decedent should so rely.

### DEFENDANTS HAD THE ABILITY AND POWER TO DESIGNATE OR TRANSFER SUSCEPTIBLE INMATES AWAY FROM HYPER-ENDEMIC PRISONS

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

80.    Defendants had the ability to divert all at-risk inmates away from the high-risk prisons in the initial facility assignment process.

81.    The classification scoring system that drives CDCR's housing placement decisions under Title 15, § 3375(b), allowed Defendants to consider environmental risk to an inmate's health, allowing consideration of an inmate's "needs, interests and desires, his/her behavior and placement score in keeping with the Department and institution's/ facility's program and security missions and public safety."

82.    CDCR's inmate classification and assignment process uses standardized forms and procedures to review numerous personal factors regarding each inmate, ostensibly in order to assign inmates only to suitable facilities.

83.    At any of numerous points in this process, Defendants could have implemented simple procedures to identify immunocompromised inmates who were particularly susceptible to Valley Fever and divert them from hyper-endemic prisons.

84.    Between September 2010 and December 2011, Defendant Cate supervised a comprehensive evaluation of the inmate classification system (hereinafter "ICS"). *See* http://www.cdcr.ca.gov/Reports/docs/2010-2011-Classification-Study-Final-Report-01-10-12.pdf.

85.    Although an Expert Panel conducted the review, Defendant Cate determined the scope of that review and excluded from that scope any consideration of the risk to inmates of contracting Valley Fever.  Defendant Cate knew of those risks but deliberately chose to ignore them in revising the process of inmate classification.

86.    Defendant Cate reviewed draft and final copies of the Expert Panel's study report and was fully aware that Valley Fever was entirely absent from that review. He failed to take any action to include in the CDCR's Classification System or in the review of that classification system the known risk to inmates of contracting Valley Fever should they be classified and endorsed to PVSP or any of the other hyper-endemic prisons.

87.    Defendant Cate was clearly aware of the risks of Valley Fever to inmates

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1   assigned to hyper-endemic prisons.  Nonetheless, Defendant Cate did not implement

2   risk-based screening of inmates or an exclusion policy that would have prevented the

3   Decedent from being housed at hyper-endemic prisons.

4   88.   Although Defendant Cate knew that these individuals were in substantial

5   danger, he failed to incorporate a screening process for the known higher-risk groups

6   for Valley Fever into the Reception and Classification Process (hereinafter "RCP"),

7   which is the initial review process designed to assign the inmate to an appropriate long-

8   term custodial facility, or assignment processes to divert susceptible inmates to

9   locations where they would not be exposed to increased risk of the disease.

10   89.   Despite both the authority and the ability to do so, Defendants failed to

11   exercise this power and exclude all at-risk and highly susceptible inmates, including

12   Decedent, to institutions outside of the San Joaquin Valley.

## IV.

## PARTIES

15   90.   Decedent, RAMON TALAMANTEZ MENDOZA, was an inmate in the

16   care and custody of the California Department of Corrections and Rehabilitation

17   ("CDCR"), who was transferred to and housed at Pleasant Valley State Prison

18   ("PVSP") on or about  September, 2008. He was subsequently diagnosed with Valley

19   Fever on or about March 19, 2009.   His Valley Fever illness was confirmed

20   disseminated (extrapulmonary) on or about August, 2013. He died on November 10,

21   2013 at the age of thirty one (31) years.

22   91.   Plaintiff C.M. a minor child, is Decedents' biological daughter and next of

23   kin. She brings suit by and through her Guardian ad Litem, Helen Cervantes. At all

24   times relevant herein, Plaintiff C.M. was and is a resident of Fresno County, California.

25   92.   Plaintiff I.M., a minor child, is Decedents' biological son and next of kin.

26   He brings suit by and through his Guardian ad Litem, Adelita Montes. At all times

27   relevant herein, Plaintiff I.M. was and is a resident of Fresno County, California.

28   93.   Plaintiff RAMONA TALAMANTEZ, a competent adult, is Decedent's

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

biological mother. She is the acting administrator of THE ESTATE OF RAMON TALAMANTEZ MENDOZA. She brings suit individually for wrongful death and loss of consortium damages, and as administrator of THE ESTATE OF RAMON TALAMANTEZ MENDOZA for recovery of Decedent's pain and suffering. At all times relevant hereing, Plaintiff RAMONA TALAMANTEZ was and is a resident of Fresno County, California.

94.     Defendant     ARNOLD     SCHWARZENEGGER     (hereinafter "Schwarzenegger"), was the former Governor of California and the Chief Executive of the state government between November 17, 2003 and January 2, 2011. Schwarzenegger  supervised and oversaw official conduct of all executive and ministerial officers, and at the time, he retained the ultimate state authority over the care and treatment of inmates in the care and custody of the CDCR. Liability as to Defendant Schwarzenegger arises from, among other factors, the following:

a.     Former Governor Schwarzenegger was apprised of the fact that inmates of African-American descent, including Decedent, were particularly susceptible to developing severe or disseminated cocci.

b.     The source of Schwarzenegger's knowledge includes, but is not limited to, informational briefing from a 2005 prisoners' rights group, Prison Movement, sent directly to Governor Schwarzenegger that he would have received, describing the threat posed by Valley Fever, and especially its threat to susceptible groups; the January, 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of certain races, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and  implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates"

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  and which directed prison officials to personally respond to a recommendation to look

2  for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations

3  for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of

4  California," which suggested the diversion and relocation of high risk inmates and

5  contained a myriad of environmental suggestions to minimize further harm; the

6  November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed

7  the various CDHS recommendations; and numerous lawsuits against Schwarzenegger

8  personally and in his official capacity in which inmates described themselves as at high

9  risk of infection due to risk factors.

10        c.    Nevertheless, former Governor Schwarzenegger personally acted to

11  deprive Decedent of his rights and failed to act to protect Decedent from the

12  constitutional injuries detailed herein.

13        95.    Upon information and belief, Defendant Schwarzenegger currently resides

14  in Los Angeles County, but at all times relevant to the allegations herein, resided in

15  Sacramento County, California. Plaintiffs bring this action against Defendant

16  Schwarzenegger in his individual capacity

17        96.    Defendant MATTHEW CATE ("Cate") was the Secretary of the CDCR

18  from 2008-2012. During that period of time, Cate was responsible for the operation of

19  the California State prisons, for the health and welfare of Decedent, and the prison

20  population as a whole, and had direct authority over every CDCR employee. Liability

21  as to Defendant Cate arises from, among other factors, the following:

22        a.    At all times relevant, Cate oversaw the management and operation

23  of all prison facilities, including decisions concerning staff deployment and training

24  that directly affects the ability of inmates, such as Decedent, to obtain adequate medical

25  care.

26        b.    Cate was also responsible for the policies and practices of the

27  organization.

28        c.    In setting and maintaining those policies and practices, Cate

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  personally acted to deprive Decedent of his rights and failed to act to protect Decedent

2  from the constitutional injuries detailed herein.

3         d.     At all times relevant, Cate knew, or in the exercise of reasonable

4  care, should have known, that the presence of coccidioidomycosis in and around CDCR

5  facilities in the San Joaquin Valley of California posed a substantial risk of serious

6  harm to inmates, including Decedent.

7         e.     Cate was apprised of the fact that inmates of with medical risk

8  factors, such as asthma and diabetes, such as Decedent, were particularly susceptible to

9  developing severe or disseminated cocci.

10         f.     The source of Cate's knowledge includes, but is not limited to, the

11  January, 2007 California Department of Health Services memorandum, widely

12  circulated for "the record," which recommended exclusion of certain races, as well as

13  elderly inmates and immune-compromised or immune-suppressed persons and also

14  recommended ground cover throughout the prison property; a January, 2007

15  memorandum written by former warden James Yates which considered whether to

16  relocate the high risk groups mentioned in the CDHS' memorandum and  implement

17  the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand

18  Jury report which discussed the Valley Fever problem, referenced "high risk inmates"

19  and which directed him to personally respond to a recommendation to look for ways to

20  "minimize the threat of Valley Fever"; the June 2007 "Recommendations for

21  Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California,"

22  which suggested the diversion and relocation of high risk inmates and contained a

23  myriad of environmental suggestions to minimize further harm; the November 11, 2007

24  policy memorandum authored by Susan Hubbard, which discussed the various CDHS

25  recommendations; and numerous lawsuits against Cate personally from 2008 onward in

26  which inmates described themselves as at high risk of infection due to risk factors.

27         g.     Cate was clearly aware of the risks of Valley Fever to inmates

28  endorsed to hyper-endemic prisons as he was receiving and responding to Fresno

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

23

1   County Grand Jury reports on those risks before and during this time.

2           h.     Cate also had a great deal of documentary information available to

3   him from other sources in the years after 2007 and until he left the position in 2012,

4   discussed herein.

5           i.      Nevertheless, Cate personally acted to deprive Decedent of his

6   rights and failed to act to protect Plaintiff from the constitutional injuries detailed

7   herein.

8       97.    Upon information and belief, Defendant Cate is a resident of Sacramento

9   County, California. Plaintiffs bring this action against Cate individually.

10       98.    Defendant JAMES A. YATES ("Yates") is the former warden of PVSP

11   and is believed to have occupied that position from at least 2005 until 2011. During this

12   time a large number of inmates contracted Valley Fever at PVSP. Liability as to

13   Defendant Cate arises from, among other factors, the following:

14           a.     As Warden, Defendant Yates was responsible for the policies and

15   practices of the prison as well as for its operational decisions, and had direct authority

16   over every employee at PVSP.

17           b.     At all times relevant, Defendant Yates was responsible for the

18   operation of PVSP and for the health and welfare of its inmates, including Decedent.

19           c.     At all times relevant, Defendant Yates knew that the presence of

20   *coccidioidomycosis* in and around PVSP posed a substantial risk of serious harm to

21   PVSP inmates, including Decedent. Sources of Defendant Yates' knowledge include

22   but are not limited to the following:

23           i.      Beginning in 2006-2007, and continuing yearly thereafter, a

24   Fresno County Grand Jury undertook the task of evaluating inmate issues at PVSP and

25   made a series of recommendations.

26           ii.     The Grand Jury issued periodic public reports beginning in

27   2007, and continuing throughout the time period relevant to the allegations herein,

28   concerning Valley Fever incidence at PVSP. It observed that "[l]ocal prison officials

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

24

1    are well aware of this health crisis. . .” and stated that inmates and staff continue to be

2    at risk from Valley Fever.

3            iii.    Defendants Yates and Cate personally received these reports,

4    and were required at a minimum to send written responses directly to the Grand Jury

5    under the authority of California Penal Code Section 919(b).

6            iv.    The Fresno Grand Jury findings informed Defendants Yates

7    and Cate, each year from 2007 on, during the period each Defendant was employed in

8    the state prison system, that inmates like Decedent were at increased risk from Valley

9    Fever and susceptible to potentially fatal health consequences as a result, if they were

10   housed at or remained at PVSP.

11           d.    Defendant Yates personally participated in the decisions not to

12   install ground cover and implement other remedial measures that would have protected

13   inmates and personally participated in the failure to protect inmates from increased risk

14   of Valley Fever; he was deliberately indifferent to inmates’ risk of contracting Valley

15   Fever, and is personally responsible for the injuries sustained by inmates who

16   contracted Valley Fever at PVSP from 2007 onward, including Decedent as specified

17   below.

18       99.    Yates is believed to reside in Corcoran, Kings County, California.

19   Plaintiffs bring this action against Yates individually.

20       100.   The true names and capacities, whether individual, corporate, partnership,

21   associate or otherwise of Defendants DOES 1 through 10, inclusive, are presently

22   unknown to Plaintiffs at this time, who, therefore, sues these Defendants by such

23   fictitious names.  Each of these Defendants DOES 1 through 50 were aware of the

24   increased risk faced by Decedent and had the authority, ability and means to reduce

25   those risks but failed to do so.  Plaintiffs will seek leave to amend this Complaint to

26   allege the true names and capacities of DOES 1 through 10, inclusive, if and when the

27   same are ascertained.

28       101.   Plaintiffs are informed and believe, and based upon that information and

COMPLAINT FOR DAMAGES

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

belief alleges, that each of the Defendants named in this Complaint are responsible in some manner for one or more of the events and happenings that proximately caused the injuries and damages hereinafter alleged.

102.   Plaintiffs are informed and believe, and based upon that information and belief allege, that each of the Defendants named in this Complaint knowingly and willfully acted in concert, conspired and agreed together among themselves, and entered into a combination and systemized campaign of activity to, *inter alia*, damage Plaintiffs and to otherwise consciously and/or recklessly act in derogation of Decedent's Eighth Amendment rights, and the trust reposed by Decedent and Plaintiffs in each of these Defendants.   Defendants' concerted actions were such that, to Plaintiffs' information and belief, and to all appearances, Defendants represented a unified body so that the actions of one Defendant were accomplished in concert with, and with knowledge, ratification, authorization and approval of each of the other Defendants.

103.   Plaintiffs are informed and believe, and based upon that information and belief allege, that each of the Defendants named in this Complaint is, and at all times mentioned herein was, the agent, servant and/or employee of each of the other Defendants and that each Defendant was acting within the course of scope of his, her, or its authority as the agent, servant, and/or employee of each of the other Defendants. Consequently, all of the Defendants are jointly and severally liable to Plaintiffs for the damages sustained as a proximate result of their conduct.

**V.**

**FIRST CAUSE OF ACTION**<br>**FOR VIOLATION OF 42 U.S.C. § 1983**<br>**[Violation of Eighth Amendment Rights]**

*(Estate of RAMON TALAMANTEZ MENDOZA against all Defendants)*

104.   Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, all of the preceding paragraphs.

105.   RAMONA TALAMANTEZ is the duly qualified, appointed and acting

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

administrator of the estate of Decedent who died intestate.  This cause of action for violation of Decedent's Eighth and Fourteenth Amendment rights is brought by said Administrator of the estate of RAMON TALAMANTEZ MENDOZA as permitted by Sections 377.30 *et seq*. of the California Code of Civil Procedure.

106.   This cause of action arises under 42 U.S.C. § 1983, and seeks to redress a deprivation under color of law of a right, privilege, or immunity secured by the Eighth and Fourteenth Amendments to the United States Constitution.

107.   Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the policies and practices described herein under the authority of California statute, regulation, and policy, to control Plaintiffs' lives, prison housing location and prison housing conditions.

108.   The Eighth Amendment prohibits inhumane methods of punishment and inhumane conditions of confinement.

109.   When the State takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume a responsibility for his safety and general well-being.  When the State fails to provide for the needs of a confined individual, including appropriate medical attention and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment.

110.   An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

111.   It is cruel and unusual punishment under the Eighth Amendment to knowingly and with deliberate indifference expose inmates to adverse environmental toxins that cause serious harm.

112.   Each Defendant had a duty to ensure that all possible steps were taken to protect high-risk inmates, including Decedent, from the objectively and sufficiently serious risk as described herein.

113.   Each Defendant knew that Decedent was housed at a hyper-endemic prison, and therefore, faced an increased risk of serious harm from infection by the

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

1  coccidoides spores known to be present at elevated levels.

2  114.  Each Defendant knew that Decedent was among the class of people

3  exceptionally susceptible to an outbreak of cocci while incarcerated at PVSP.

4  115.  Defendants have engaged in a pattern and practice of conduct which they

5  knew would place and keep California prison inmates, including Decedent, incarcerated

6  at locations of unreasonable risk of personal injury.

7  116.  At all relevant times, and despite the ability and authority to do so,

8  Defendants, and each of them, did not employ any screening process to divert higher-

9  risk individuals, including Decedent, from assignment to prison facilities in the San

10  Joaquin Valley. Rather, Defendants categorically refused to exclude highly at-risk

11  individuals, such as Decedent, from incarceration in these infected facilities.

12  117.  The Defendants' failure to adopt an exclusion policy, which would have

13  prevented Decedent's exposure to coccidoides spores, and each Defendant's actions or

14  inactions regarding remedial measures to ensure safe conditions caused Decedent's

15  death.

16  118.  Each Defendant's failure to implement protective remedial measures

17  throughout their tenure allowed the dangerous conditions at the prison to continue

18  unabated and proximately and substantially caused Decedent to be exposed to a

19  significantly greater risk of exposure at all times subsequent.

20  119.  Despite numerous, repeated and explicit warnings about the serious danger

21  of Valley Fever to inmates at the hyper-endemic prisons, and most especially to those

22  identified as high-risk persons with enhanced susceptibility for disseminated cocci

23  disease, Defendants failed to take the reasonable, obvious steps needed to protect those

24  involuntarily in their charge.

25  120.  Defendants knowingly and recklessly promulgated or continued a practice

26  and policy of failing to employ mitigation measures at PVSP, such as paving,

27  landscaping or planting grass to minimize the spread of the spores, or implementing

28  appropriate measures with respect to ventilation systems to prevent spores from

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

COMPLAINT FOR DAMAGES

entering the interior of the facility.

121.   Defendants knowingly and recklessly promulgated or continued the practice and policy of failing to warn inmates about the dangers of prisons to which they were involuntarily and forcibly transferred.

122.   Had each Defendant implemented protective remedial measures, then Decedent's risk of contracting Valley Fever would have been significantly reduced.

123.   The Defendants' deliberate indifference to those risks and failure to take action to prevent or reduce the risk caused Decedent's constitutional injuries.

124.   Because Defendants, and each of them, failed to implement any reasonable preventive measures, the incarceration of Decedent was the equivalent of conducting a human medical experiment without Decedent's consent.

125.   While a percentage of inmates might be expected to survive the disease, each of the Defendants knew that, for an unacceptable percentage of inmates, including Decedent, assignment to PVSP was a death sentence.

126.   Despite having knowledge about preventive measures, Defendants never implemented these preventive measures at PVSP and instead have engaged in a pattern and practice that have placed and kept Decedent in situations of unreasonable risk of substantial personal harm.

127.   At all times relevant, each of the Defendants knowingly and unreasonably disregarded the objectively intolerable risk of harm to Decedent by failing to take reasonable and recommended measures to abate the risk of contracting Valley Fever. Defendants, and each of them, have shown deliberate and willful indifference to the risk imposed upon Decedent, all in violation of his Eighth Amendment rights.

128.   As proximate result of the aforementioned acts and omissions of said Defendants, and each of them, before his death, Decedent sustained great physical and mental pain, injury and shock to his nervous system, fear, anxiety, anguish, torment, degradation, emotional distress, loss of strength, and sense, knowledge and awareness of impending death during the time he was sickened with Valley Fever.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

COMPLAINT FOR DAMAGES

129.   As a proximate result of the aforementioned acts and omissions of said Defendants and each of them, Decedent died.

130.   As a direct, proximate and foreseeable result of the conduct of Defendants, and each of them, Plaintiff has been damaged in an amount to be proven at trial and which exceeds the jurisdictional limits of this Court.

131.   For the reasons stated herein, Plaintiff is entitled to punitive and/or exemplary damages in an amount sufficient to punish Defendants.  Additionally, by reason of all the foregoing and following allegations, Plaintiffs were required to retain counsel to institute and prosecute this action and to render legal assistance and advice that he may properly vindicate the loss and impairment of his rights and the rights of the Decedent and by reason thereof, Plaintiffs request and is entitled to a reasonable sum of attorney's fees pursuant to 42 U.S.C. § 1988.

## VI.

### SECOND CAUSE OF ACTION
### FOR VIOLATION OF 42 U.S.C. § 1983
### [Substantive Due Process Under the Fourteenth Amendment]
*(Plaintiffs C.M., I.M., and RAMONA TALAMANTEZ against all Defendants)*

132.   Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1 through 103.

133.   Plaintiffs C.M. and I.M. are minor children and therefore bring this lawsuit by and through their respective guardians.

134.   As the biological children of Decedent, Plaintiffs C.M. and I.M. have a cognizable interest under the Due Process clause of the Fourteenth Amendment to the United States Constitution to be free from unwarranted state interference in their familial relationship with their father, the Decedent.

135.   Likewise, as the biological mother of Decedent, Plaintiff RAMONA TALAMANTEZ has a cognizable interest under the Due Process clause of the Fourteenth Amendment to the United States Constitution to be free from unwarranted state interference in her familial relationship with her son.

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

136.   At all times relevant, during all the failures and omissions relevant to Decedent's death, Defendants, and each of them, acting within the course and scope of their duties, deprived Decedent of his constitutional rights as delineated above that led to his death.

137.   As a result of the unconstitutional acts and omissions outlined above, Decedent died. Therefore, said unconstitutional acts and omissions caused Plaintiffs C.M., I.M., and RAMONA TALAMANTEZ to be deprived of the love, affection, society and comfort of their father son, and/or son, respectively, and constituted a violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment.

138.   As a direct and proximate cause of the acts and omissions of Defendants, and each of them, Plaintiffs each suffered extreme and severe mental anguish and pain and have been injured in mind and body, all to Plaintiffs' general damages, which are hereby sought, according to proof. Plaintiffs have also been deprived of the life-long comfort, support, society, care and sustenance of Decedent, and will continue to be so deprived for the remainder of their natural life, all to Plaintiffs' damages in an amount which is hereby sought, according to proof.

139.   The aforementioned acts of the Defendants named herein were willful, wanton, reckless and oppressive and done with the intent to deprive Plaintiffs of their constitutional rights under the Fourteenth Amendment, thereby justifying the award of exemplary and punitive damages as to each of these individual Defendants.

///

///

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

COMPLAINT FOR DAMAGES

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

(a)  compensatory damages in an amount to be proven at trial;

(b)  interest on any compensatory damages;

(c)  punitive and/or exemplary damages in an amount to be determined at trial;

(d)  interest on any punitive and/or exemplary damages;

(e)  reasonable attorney's fees pursuant to 42 U.S.C. §§ 1988 and 1997(e) at the maximum allowable rate by statute;

(f)  costs of suit, including the expense of experts;

(g)  such other and further relief as this Court may deem just and proper.


DATED:  November 9, 2015          BOUCHER LLP


By:  ___/s/ Brian M. Bush___
RAYMOND P. BOUCHER
HERMEZ MORENO
MILIN CHUN
BRIAN M. BUSH
Attorneys for Plaintiffs

BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903

32

COMPLAINT FOR DAMAGES

## <u>JURY DEMAND</u>

**WHEREFORE**, Plaintiff respectfully demands a trial by jury on all issues herein presented.

DATED:  November 9, 2015          BOUCHER LLP


By:    /s/ Brian M. Bush
          RAYMOND P. BOUCHER
          HERMEZ MORENO
          MILIN CHUN
          BRIAN M. BUSH
          Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES